**17 WEST MILL ST., LLC, a Colorado limited liability company, Plaintiff–Appellant,**

v.

**Floyd L. SMITH, Dennis Shaw, and First Horizon Home Loan Corporation, Defendants–Appellees.**

No. 10CA0955.

Colorado Court of Appeals, Div. VII.

June 9, 2011.

Stevens, Littman, Biddison, Tharp & Weinberg, LLC, Craig A. Weinberg, Boulder, Colorado, for Plaintiff–Appellant.

Floyd L. Smith, Durango, Colorado, for Defendant–Appellee Floyd L. Smith.

Sweetbaum, Levin & Sands, P.C., Alan D. Sweetbaum, Jonathan G. Nash, Denver, Colorado, for Defendants–Appellees Dennis Shaw and First Horizon Home Loan Corporation.

Opinion by Judge BOORAS.

Plaintiff, 17 West Mill St., LLC, appeals from the trial court's judgment entered after a bench trial rejecting most of its claims and awarding only nominal damages against defendants, Floyd Smith, Dennis Shaw, First Horizon Home Loan Corporation, and the

Public Trustee of La Plata County (Public Trustee). We affirm in part, reverse in part, and remand for further proceedings.

## I.  Background

This appeal involves 17 West Mill's lawsuit alleging that a deed of trust securing a promissory note was invalidly released.

### A.  Underlying Loans

Jonathan "Johann" Robbins is the sole member and manager of 17 West Mill, which is involved in developing and holding commercial real estate as investment property. Beginning in 2004, Robbins began lending money to local real estate developer James Kreutzer. Robbins made a series of similar loans to Kreutzer over several years, some of which were made through 17 West Mill.

The series of loans that gave rise to this case started in March 2006. At that time, 17 West Mill made a loan to one of Kreutzer's companies, Animas Investments, LLC, using a $75,000 promissory note that was secured by a deed of trust on certain real property described as "Parcel F, Ptarmigan Ridge." The deed of trust conveyed the property to the Public Trustee. Kreutzer's attorney, Floyd "Bud" Smith, prepared the note and deed of trust, which was recorded on March 26, 2006.

### B.  Deed Swaps

One month later, Kreutzer asked 17 West Mill to do a "deed swap" or exchange of collateral—substituting a different deed of trust to real property for the original deed of trust securing the note. Robbins, on behalf of 17 West Mill, authorized the substitution and the recording of a new deed of trust upon release of the original deed of trust. Then Smith prepared a pre-printed form requesting release of the March 2006 deed of trust, signed the form as "Floyd L. Smith as attorney for 17 West Mill," and presented it to the Public Trustee. Upon release of the deed of trust by the Public Trustee, a deed of trust on "Phase 1C of Lightner Creek Village" as substitute collateral was executed and recorded.

Thereafter, at least three more "deed swaps" took place, each following a similar procedure as the first. Each time, Smith obtained Robbins's authorization and gave a request for release to the Public Trustee, which he signed as "Floyd L. Smith as attorney for lender." Ultimately, 17 West Mill held a deed of trust on a condominium property identified as "Unit 42 of Lightner Creek Village."

In January 2007, Kreutzer, individually and on behalf of another of his companies, Wildcat Properties, LLC, signed a $134,000 promissory note to Robbins, doing business as 17 West Mill, that was secured by the deed of trust on Unit 42. Robbins handwrote on the note, "this replaces the $75,000 note from '06 and the deed of trust still applies." However, the $134,000 note was never recorded, and the $75,000 note was never marked as "paid" or otherwise cancelled.

### C.  Sale of Unit 42

Meanwhile, Todd Demko, another area real estate developer who shared an office with Robbins, also made loans to Kreutzer on similar terms to those made by Robbins and 17 West Mill. Smith believed that Robbins and Demko were business partners, in part because of these similar loan transactions.

In May 2007, Kreutzer entered into a contract to sell some real estate at Lightner Creek—including Unit 42—to Dennis Shaw. The sale was part of a complex refinancing deal worth $14 million that involved several different lenders and a number of different properties. In order to deliver Unit 42 unencumbered by the deed of trust held by 17 West Mill, Smith drafted a letter for Robbins to sign authorizing release of the Unit 42 deed of trust. Smith learned from Demko that Robbins was at that time out of the country and unavailable. Believing that Demko could authorize release of Unit 42 on behalf of Robbins, Smith revised the letter for Demko to sign as "Johann Robbins by Todd Demko," and Demko signed the letter. Smith then filed a request for release of deed of trust with the Public Trustee that he again signed as "Floyd L. Smith as attorney for lender." The request for release also recited

that the "indebtedness secured by the deed of trust has been paid and/or the purpose of the deed of trust has been fully satisfied." Accordingly, the Public Trustee executed the release of 17 West Mill's deed of trust on Unit 42.

Prior to its release from the 17 West Mill deed of trust, Unit 42 was already encumbered by a previous deed of trust, the face amount of which was greater than the value of Unit 42. At closing of the sale to Shaw, that deed of trust was released for $293,317.32 as part of the refinancing deal. Shaw granted a new deed of trust on Unit 42 to First Horizon Home Loan Corporation, the company with which he had arranged financing for the purchase.

### D. Lawsuit

Almost a year later, Robbins learned that 17 West Mill's deed of trust on Unit 42 had been released, and that no deed of trust on substitute collateral had been recorded. Smith explained that a draft of the deed of trust on substitute collateral was prepared but its execution and recording were inadvertently "overlooked." Shortly after this discovery, a deed of trust in favor of 17 West Mill was recorded on a condominium property identified as "Unit 50 of Lightner Creek Village."

Subsequently, 17 West Mill filed suit alleging claims for, inter alia, negligence, civil conspiracy, and breach of fiduciary duty against Smith, as well as several other claims against Shaw, Kreutzer, the Public Trustee, First Horizon, and Animas. The amended complaint requested as relief, "an equitable lien on Unit 42, a declaratory judgment that the release of the Unit 42 Deed of Trust was void and that the Unit 42 Deed of Trust is in first position and senior to all other liens."

Following a two-day bench trial, the trial court determined that 17 West Mill needed to prove that the release of the deed of trust on Unit 42 was obtained fraudulently in order to render it void. The court concluded that 17 West Mill had not met that burden. Specifically, the trial court reasoned that to prove fraud, 17 West Mill was required to show Smith knowingly made a false statement, but Smith had been only negligent in

requesting release of the deed of trust. Accordingly, the trial court denied 17 West Mill's equitable lien, judicial foreclosure, and declaratory judgment claims, and awarded only nominal damages for Smith's negligence, because the court could not determine what effect failure to release the deed would have had on the multi-part refinancing transaction. 17 West Mill appeals.

### II. Standard of Review

■ The trial court's "[f]indings of fact shall not be set aside unless clearly erroneous." C.R.C.P. 52. However, we are not bound by the trial court's conclusions on issues of law, which we review de novo. *See Montemayor v. Jacor Commc'ns, Inc.*, 64 P.3d 916, 922 (Colo.App.2002).

■ The interpretation of a statute is an issue of law. *McIntire v. Trammell Crow, Inc.*, 172 P.3d 977, 979 (Colo.App.2007). In interpreting a statute, "our primary duty is to give effect to the intent of the General Assembly," looking first to the statute's plain language. *Id.* But if the statute is not clear on its face, then we may resort to other modes of construction. *In re 2000–2001 Dist. Grand Jury*, 97 P.3d 921, 924 (Colo.2004).

### III. Release of Deed of Trust

■ The trial court analyzed whether the release of the deed of trust was void as the result of a fraudulent request under section 38–39–102(8), C.R.S.2010, and found it was not void because the elements of actual fraud had not been established. We disagree with the trial court's interpretation and conclude that the release of the deed of trust was void under section 38–39–102(8). Therefore we need not address 17 West Mill's argument that the release was "unauthorized" under the common law.

Under section 38–39–102(8), "[i]f the written request to release the lien of any deed of trust is a fraudulent request, the release by the public trustee based upon such request shall be void." Here, the trial court construed the term "fraudulent" as requiring proof of the elements of common law actual fraud, including that the person making a false representation knew the representation

was false. However, it is not clear that "fraudulent" in the context of section 38–39–102(8) requires proof of the elements of actual fraud.

Section 38–39–102(8) does not define "fraudulent request," nor is the term clear on its face, as the word "fraudulent" in a statute does not automatically mean "actual fraud," but can also have a broader meaning. *See, e.g., Sound Infiniti, Inc. v. Snyder*, 169 Wash.2d 199, 237 P.3d 241, 244 (2010) (in business corporations law .context, "fraudulent" corporate action was *not* interpreted so narrowly as to encompass only common law actual fraud—which requires proof of intent to deceive). Additionally,

> [i]n equity law, the term fraud has a wider sense, and includes all acts, omissions, or concealments by which one person obtains an advantage against conscience over another, or which equity or public policy forbids as being to another's prejudice; as acts in violation of trust and confidence. This is often called constructive, legal, or equitable fraud, or fraud in equity.

*Encyclopedia of Criminology* 175 (Vernon C. Branham & Samuel B. Kutash eds., 1949). " 'Constructive fraud' has been defined as a breach of a legal or equitable duty that the law declares to be fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests, irrespective of the moral guilt of the perpetrator." *Barnett v. Elite Properties of America, Inc.*, 252 P.3d 14, 23 (Colo. App.2010) (citing 37 C.J.S. *Fraud* § 5 (2008)).

▆ Because we think the language of section 38–39–102(8) could be construed in a number of ways, we may "look to legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme." *Sperry v. Field*, 186 P.3d 133, 137 (Colo.App.2008), *aff'd*, 205 P.3d 365 (Colo.2009).

Testimony from the hearings on Senate Bill 43, which added section 38–39–102(8), reflects the legislature's desire to avoid placing the burden on the public trustee to investigate the authenticity of signatures in each and every request for release. Hearings on S.B. 43 before the H. Judiciary Comm., 58th Gen Assemb., 2d Sess. (Mar. 17, 1992) (state-

ment of William G. Horlbeck, Member, Colorado Bar Ass'n, Real Estate Section) ("[P]ublic trustees are not judicial officers; they are not qualified to look at signatures; they are not empowered to conduct an investigation with regard to who should sign requests for release."); *see People v. Rockwell*, 125 P.3d 410, 419 (Colo.2005) ("While less persuasive than a statement of a legislator during debate, testimony before a congressional committee helps illustrate the understanding of legislators and, thus, helps identify the legislative intent."). The legislature aimed to prevent deception of the public trustee and wrongful releases of deeds of trust, not to punish only those who intentionally deceived. Thus, the General Assembly contemplated something akin to constructive fraud when it adopted subsection (8). *See Upson v. Goodland State Bank & Trust Co.*, 823 P.2d 704, 706 (Colo.1992).

▆ It is true that constructive fraud typically applies to situations involving a fiduciary relationship, and one does not exist here. *E.g., Sec. Nat'l Bank v. Peters, Writer & Christensen, Inc.*, 39 Colo.App. 344, 351, 569 P.2d 875, 881 (1977). However, section 38–39–102, C.R.S.2010, imposes a number of duties on a person seeking to release a deed of trust. *Barnett*, 252 P.3d at 23 ("[T]he existence of a fiduciary relationship is not required to prove a claim for constructive fraud."). Taking into consideration the legislative intent behind the enactment of section 38–39–102(8), we conclude that a material misrepresentation as to statutory requirements in a request for release of deed of trust makes the request "fraudulent" under that statute.

Here, Smith made two material misrepresentations in the request for release: (1) signing the release as "attorney for lender," and (2) representing that the purpose of the deed of trust had been satisfied. Both of these misrepresentations involved statutory requirements for the public trustee's release of the deed of trust: signing as "attorney for lender" obviated the need for a written request from the actual holder of the evidence of the debt, and representing that the purpose of the deed of trust had been fully or

partially satisfied was necessary to secure the release. § 38–39–102(1), C.R.S.2010. Misrepresentations regarding such requirements, whether made with intent to defraud or not, are contrary to the legislative intent behind the enactment of section 38–39–102(8) and constitute sufficient grounds to void a release under subsection (8).

We reject the trial court's overly narrow interpretation of "fraudulent" under section 38–39–102(8) and conclude that Smith's representations qualify as "fraudulent." The trial court should have found that the release of the deed of trust was void and entered a declaratory judgment that restores the priority of the Unit 42 deed of trust. While we recognize that this result is harsh as to bona fide purchaser Dennis Shaw, he may pursue other available legal remedies.

## IV. Damages for Smith's Negligence

On appeal, 17 West Mill contends that the correct measure of damages for Smith's negligence in releasing its lien is $81,247.42, which is the amount that was remaining from the purchase price for Unit 42 after the first lien was released for the amount of $293,000. However, as the trial court observed, this case involved a complicated refinancing of numerous properties. Under the circumstances here, the trial court found that 17 West Mill did not meet its burden to establish whether the failure to release the lien would have resulted in 17 West Mill being paid for its lien, or whether it would have terminated the refinancing, leading Shaw to simply purchase a different unit.

We agree that there was insufficient evidence from which to determine the proper amount of damages. While 17 West Mill contends that it should have been awarded more than nominal damages, it did not otherwise challenge the nominal damages award. Accordingly, we uphold the trial court's decision to award only nominal damages.

## V. Conclusion

Because the trial court's factual findings and the evidence support a legal result that the release of the deed of trust was based on a "fraudulent request" within the meaning of section 38–39–102(8), that part of the trial court's judgment finding no fraud is reversed and the case is remanded for further proceedings as to 17 West Mill's claims for a declaratory judgment, reinstatement of the Unit 42 Deed of Trust, and judicial foreclosure. The remainder of the judgment is affirmed.

Judge BERNARD and Judge TERRY concur.